Ralph J. Solow and Celia O. Solow v. Commissioner.
Solow v. Commissioner
Docket No. 75595.
United States Tax Court
T.C. Memo 1963-87; 1963 Tax Ct. Memo LEXIS 257; 22 T.C.M. (CCH) 398; T.C.M. (RIA) 63087; March 27, 1963
Mason G. Kassel, Esq., and David R. Frazer, Esq., for the petitioners. John J. Hopkins, Esq., and Alvin C. Martin, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined a deficiency of $711,646.86 in petitioners' income tax for the calendar year 1950 and a deficiency in income tax of $8.94 and additions to tax of $286.09 and $190.74 under sections 294(d)(1)(A) and (d)(2), [1] respectively, for the calendar year 1951. Petitioners have conceded the deficiency for 1951. Petitioners have not met their burden of proof regarding section 294(d)(1)(A) and the Commissioner is thereby sustained. The section 294(d)(2) addition to tax for 1951 has been conceded by the Commissioner. See Commissioner v. Acker, 361 U.S. 87. The sole remaining issue before us is whether gain realized by petitioners on sale *259 of stock in certain corporations is taxable as ordinary income because such corporations were "collapsible" within the purview of section 117(m). Findings of Fact Some of the facts have been stipulated and are so found. Petitioners Ralph J. Solow and Celia O. Solow are husband and wife residing at Englewood, New Jersey, at all times material hereto. They filed joint cash basis Federal income tax returns for the calendar year 1950 with the collector of internal revenue for the third collection district of New York. They filed joint cash basis income tax returns for the calendar year 1951 with the collector of internal revenue for the fifth collection district of New Jersey. Ralph J. Solow (hereinafter referred to as petitioner) has been in the business of publishing calendars for advertising purposes since 1923. By 1947, he had become desirous of investing surplus personal funds. He believed that construction of an apartment house project would be profitable and, since he had another occupation, he sought an associate who was experienced in the building business. He contemplated that said associate would supervise the construction. A friend introduced him to Sidney Sarner (hereinafter *260 referred to as Sarner) who had prior building experience. Petitioner and Sarner agreed to construct an apartment house project. Petitioner was to contribute funds, and help arrange for credit. Sarner was to contribute funds and supervise the actual construction. On April 28, 1947, petitioner and Sarner caused to be organized a New Jersey corporation named Teaneck Gardens, Inc., for the stated purpose of constructing and owning a garden apartment project in Teaneck, New Jersey, pursuant to the provisions of section 608 of the National Housing Act. The land for this project was purchased for approximately $40,000, with funds contributed equally by petitioner and Sarner. On July 22, 1947, petitioner and Sarner caused to be organized under New Jersey law a corporation known as Sarner & Solow Construction Co., Inc., (hereinafter referred to as Construction Co.) which was organized to act as the general contractor with respect to the construction of the garden apartment project to be owned by Teaneck Gardens, Inc. Each of the above corporations issued 100 shares of common stock, which were owned 50 by Sarner, 49 by petitioner, and one qualifying share by an attorney for petitioner's benefit. *261 By an application for mortgage insurance dated July 10, 1947, Teaneck Gardens, Inc., as proposed mortgagor, and Alexander Summer Mortgage Co. (hereinafter referred to as Mortgage Co.) as proposed mortgagee, applied to the Federal Housing Administration (hereinafter referred to as the FHA) for insurance, pursuant to section 608 of the National Housing Act, on a mortgage to be issued on the proposed construction of apartment units. On said application it was stated that Sarner was the person to whom correspondence should be addressed. Under date of November 18, 1947, the FHA issued a commitment for insurance pursuant to the aforesaid application. On or before November 26, 1947, this commitment was assigned by the Mortgage Co. to The Paterson Savings and Trust Company (hereinafter referred to as the Bank). By November 26, 1947, the date on which various documents were executed, and referred to as the closing date, final plans for the construction of the project had been agreed to by all parties. Under date of November 26, 1947, Construction Co., as contractor, and Teaneck Gardens, Inc., as owner, executed a "lumpsum" contract to build the relevant project. Under date of November 26, 1947, Teaneck *262 Gardens, Inc., also entered into a building-loan agreement with the Bank to obtain the necessary financing for the proposed construction. Under date of November 26, 1947, Teaneck Gardens, Inc executed a mortgage and bond in favor of the Bank to secure the loan to be advanced pursuant to the building-loan agreement. On the same date, Teaneck Gardens, Inc., executed a mortgagor's certificate which was forwarded to the FHA. Shortly after November 26, 1947, the date on which the aforesaid mortgage and bond were executed, Construction Co. commenced physical construction of the subject apartment buildings. On November 28, 1947, Teaneck Gardens, Inc., and Construction Co. modified the "lump-sum" construction contract and agreed that the construction work would be done on a cost basis. In accordance with the procedure prescribed in the building-loan agreement, Teaneck Gardens, Inc., submitted to the Bank, at periodic intervals, requests for payment on certain FHA forms. Attached to said applications were other FHA forms, known as contractor's requisitions, which had been prepared by the Construction Co. Upon receipt of the aforesaid FHA forms by the Bank, they were forwarded to the FHA for *263 inspection and verification of the percentage of completion set forth therein and for approval of the net amount due on the requisition. An FHA inspector assigned to the project would complete a project inspection report and said report would be used by the FHA to complete that section of the contractor's requisition designated "For FHA Use." Upon verification of the contractor's requisition, the FHA would complete the application for Insurance of Advance of Mortgage Proceeds and return it to the Bank, showing approval of a payment of a designated amount. A request for payment dated November 24, 1948, and a corresponding FHA inspection report, dated November 26, 1948, indicated that the project was 100 percent complete. A final request for payment was made by Teaneck Gardens, Inc., on January 12, 1949. It was approved by the FHA on January 20, 1949, subject to holding a sum of $2,906 in escrow until installation of play area equipment and rubbing down of retaining walls by a completion date of April 15, 1949. On February 2, 1949, Teaneck Gardens, Inc., entered into an escrow deposit agreement with the Bank. An amount of $2,906 was held in escrow, which was double the estimated cost *264 of completing the items enumerated. By a letter dated April 7, 1949, the Bank advised the FHA that it had been informed that the items set out in the escrow agreement had been completed. An FHA inspector's report received by the FHA on April 13, 1949, reported that the designated items had been completed. The FHA then advised the Bank that it was permissible for them to disburse the amount of escrow. The total cost of construction of the Teaneck Gardens project was $1,531,326.66. The amount of the FHA insured mortgage was $1,592,000. The Teaneck Gardens project consisted of 204 garden-type apartments in nine brick buildings, three stories high, and 53 garages. Certificates of occupancy were issued by the Township of Teaneck on various dates between May 14, 1948, and October 1, 1948. From approximately October 1948 through August 1950, Teaneck Gardens was fully rented and had a waiting list. Teaneck Gardens was never listed for sale prior to August 29, 1950. A broker periodically attempted to effectuate a sale, but neither petitioner nor Sarner was desirous of selling. At about the time that Teaneck Gardens was nearing completion, petitioner and Sarner became involved with the construction *265 of a series of stores in Leonia, New Jersey, on land which they had previously held as partners for almost a year. The stores were sold upon completion. Petitioner and Sarner also purchased a small tract of land in Teaneck, New Jersey, which had a swampy condition, and, after putting in drainage and storm sewers, they resold the land. In late 1948 petitioner and Sarner decided to build another apartment project. Under date of December 21, 1948, petitioner and Sarner, as partners, entered into an agreement with the Allison Land Company, Inc., whereby they agreed to purchase for $160,000 a parcel of land located in Fort Lee, New Jersey, (hereinafter referred to as Linwood Park). At the time of purchase, the nearest comparable apartment project was 6 or 7 miles distant and in the opposite direction from New York City. Shortly after, petitioner and Sarner proceeded to preliminarily develop the tract. During the fall of 1948, petitioner and Sarner had commissioned an architect to draw plans for the Linwood Park apartment buildings, which plans were completed in the summer of 1949. There were some discussions regarding a Linwood Park shopping center during this period, but detailed plans *266 for a shopping center were not considered until August 1950, when Sarner requested them from the architect. On February 18, 1949, petitioner and Sarner caused to be organized under New Jersey law a corporation named Linwood Park, Inc., whose 100 shares of outstanding common stock were owned 50 by Sarner, 49 by petitioner, and one qualifying share by an attorney for petitioner's benefit. Under date of February 28, 1949, Mortgage Co., as proposed mortgagee, and Sarner and petitioner, as sponsors on behalf of 13 proposed mortgagors designated Linwood Park, Inc. Sections 1 to 13, inclusive, submitted applications for mortgage insurance to the FHA. On March 2, 1949, the mayor and council of the Borough of Fort Lee enacted an ordinance, pursuant to an application in behalf of petitioner and Sarner, rezoning the Linwood Park property to allow 6-story apartment houses on approximately 61 acres and, on approximately a 7-acre portion of the property, business uses. On March 15, 1949, Allison Land Company conveyed the Linwood Park land to Linwood Park, Inc., pursuant to the agreement of December 21, 1948. During June 1949, the FHA prepared separate project analyses with respect to each *267 application for mortgage insurance, and under the date of June 30, 1949, the FHA issued insurance commitments under section 608 with respect to said mortgage insurance applications. Actual construction was commenced early in July 1949. In September 1949, 13 corporations were organized by petitioner and Sarner, each for the stated purpose of constructing and owning a rental housing project in the Borough of Fort Lee, New Jersey. These corporations were named Linwood Park, Inc. Sections 1 through 13. The outstanding common stock of each was owned 24 by Sarner, 25 by petitioner, and one qualifying share by an attorney for Sarner's benefit. Each corporation was to construct and own a 5-story apartment building with 90 family units, including a superintendent's apartment, contained therein. The total apartment units planned for all 13 apartment buildings was 1,170, and in addition, 312 garages were to be constructed. Under date of September 29, 1949, Linwood Park, Inc., conveyed approximately 2 acres of the property known as Linwood Park to each of the Linwood Park, Inc. Sections 1, 2, 3, 4, 5, 10, 11, and 12. On October 24, 1949, Linwood Park, Inc., conveyed approximately 2 acres of *268 the property known as Linwood Park to the remaining section corporations, i.e., Linwood Park, Inc. Sections 6, 7, 8, 9, and 13. The land so conveyed was transferred for the same cost at which it was acquired by Linwood Park, Inc. Also, the land so conveyed was for the purpose of constructing apartment buildings as detailed above. Linwood Park, Inc. Sections 1 through 13 obtained construction financing through FHA insured mortgage loans, pursuant to section 608 of the National Housing Act; as amended. Said loans were made by the Bank (to which the FHA insurance commitments had been assigned) and secured by mortgages and mortgage bonds. Each mortgage given by the respective Linwood Park, Inc. section corporation covered that land which said section corporation had acquired from Linwood Park, Inc.
In conjunction with the building loan agreements referred to above, petitioner and his wife and Sarner and his wife signed indemnity agreements with the Bank, to protect it from possible failure of the borrower, Linwood Park, Inc. Sections 1 through 13, to perform the requirements of the building loan agreements. Petitioner and Sarner also signed a guarantee agreement with Paramount Plumbing *269 and Heating Co. on September 26, 1949, to assure payment to the latter company for the installation of sewer systems, water mains, streets, trees, electric service poles, street lighting, etc. Under date of September 29, 1949, section companies 1, 2, 3, 4, 5, 10 and 11 each entered into a "lump-sum" contract to build with Construction Co. as contractor, and each section company as owner in each instance. Under date of October 24, 1949, the remaining section companies each entered into similar contracts. Construction Co. served as general contractor and several sub-contracts were entered into. Said subcontracts were let on a total project basis, and no separate cost figures were kept for each section company. Under date of September 29, 1949, Linwood Park, Inc., deeded for nominal consideration approximately 7 acres of its land to petitioner and Sarner, as partners. It was anticipated that said land would be used for the construction of a shopping center. Approximately five additional acres were conveyed to the Borough of Fort Lee for use as streets. The approximately 30 acres remaining from the original 68-acre tract were held for possible future use. Sarner alone supervised *270 the actual construction of the Linwood Park project. Sarner received a salary of $300 per week for his construction activities and petitioner received a salary of approximately $100 per week. Petitioner visited the project approximately every other day for a few hours to inspect and sign checks in blank for various purposes. He did not inspect all the sections on each of his visits. He was not required to visit the project at all, but did so only because he was interested in the development. With the exception of certain financing activities, Sarner took complete charge of the construction and ran the operation. During March or April 1950, Sarner suggested use of surplus funds from the section corporation's FHA guaranteed mortgage proceeds for development of the contemplated shopping area. Petitioner was concerned over the questionable propriety of such a course, and at his insistence they consulted an attorney in early April 1950 and were advised by him that the mortgage monies should not be used for the shopping center project at that time. The attorney also advised that any section company surpluses existing upon the completion of the housing projects could be lent for the purpose *271 of building the shopping center. During this period, petitioner and Sarner agreed to modify the lump-sum construction contracts into cost contracts. During this March-April 1950 period, Sarner began to demand that he receive a two-thirds interest in the proposed shopping center. He claimed that his status as the builder entitled him to it. Sarner also began to demand that a management company, which he would wholly own, should be paid a fee of 5 percent of the gross rentals of the various projects. Drafted agreements according Sarner a management fee of 3 percent of gross annual rentals and a 65 percent interest in the contemplated shopping center were not effectuated only because petitioner did not accept, and refused to sign them. Although they had an amicable relationship before, Sarner and petitioner's association became difficult and unfriendly after March or April 1950. On June 12, 1950, petitioner visited the Linwood Park project. At about noon of said date, Sarner asked petitioner to sign some blank checks for the purpose of paying bills and petitioner did so, signing approximately two dozen of them for such purpose. The signing of blank checks in advance by petitioner *272 was not unusual. After the signing was completed, Sarner began repeating his demands that the mortgage monies be used to build the shopping center, that he receive the management contracts, and that he own two-thirds of the shopping center. A rancorous argument ensued, during which petitioner unequivocally refused to agree to Sarner's proposals. Sarner then threatened to "dump" the entire project and petitioner defied him to do so. Nothing was resolved, and petitioner left and returned to New York. Seven of the above blank checks which petitioner had signed on June 12, 1950, were in fact later filled in by Sarner or at his direction, naming Sarner as payee. Said checks totaled $685,540. They contained notations that they were for "services as per agreement above construction cost." Said notations were not on the checks when petitioner had signed them and no such agreement for payment had been entered into. The drawers of said checks were Construction Co. and several of the section companies. The aggregate amount of the checks approximately equaled the balances in the respective bank accounts of the drawers. Before learning the above, petitioner became worried about the checks signed *273 in blank and investigated into the situation. As a result of his inquiries, he caused payment on the checks to be stopped on June 14, 1950. Thereafter, he went to the Construction Co. office and removed the remaining signed blank checks. Several conferences ensued between petitioner, Sarner and their respective attorneys and accountants. The attorneys attempted to bring the parties together. Later, petitioner suggested an equal division of the properties, but Sarner refused. Petitioner subsequently offered to purchase Sarner's interests, whereupon Sarner became excited and stated that no one was going to buy the project, except himself. Sarner averred that if he could not buy the properties, he would cause financial ruin. Cognizant of his liability under indemnity agreements and believing that financial ruin would otherwise result, petitioner reluctantly agreed, on or about June 22, 1950, to sell all of his interests in the relevant ventures to Sarner if a fair price and fair conditions could be agreed to. At this time neither price nor contract condition negotiations had commenced. No agreement was reached regarding price until approximately July 31, 1950. At that time the parties *274 agreed to an amount of $1,333,333 for all of petitioner's interests. No agreement was reached at that time with respect to other necessary contract conditions. Petitioner refused to permit Sarner to borrow the money to pay for petitioner's stock from any or all of the 16 corporations. Petitioner did not agree to any proposal that any of the relevant corporations redeem his stock. Final terms were not agreed to until August 29, 1950, and no contract to sell existed prior to that date. On August 29, 1950, petitioner, pursuant to an agreement bearing that date, disposed of all of his stock in Teaneck Gardens, Inc., Construction Co., Linwood Park, Inc., and Linwood Park Inc. Sections 1 through 13 for $1,333,333. Petitioner, as seller, Sarner Bros., Inc., as buyer, and Sarner executed the agreement. It was petitioner's understanding that Sarner Bros., Inc., was a corporation wholly owned by Sarner. Paragraph 13 of the agreement of sale provides as follows: 13. Whereas the Seller is concerned only with the said total purchase price of $1,333,333, but as a condition to agreeing upon the same, a breakdown thereof was required by the Buyer and Sarner, and therefore, solely for the purpose *275 of arriving at said total purchase price of $1,333,333, and in the light of all the differences and conflicting claims between the Seller and Sarner concerning their interests in the corporations and between themselves, the parties herein have used the following valuations of the respective stock interests of the Seller, to wit: 25 shares, common stock in
each of 13 Sections at
$95,000 for each block of
25 shares, a total of
$1,235,000.
50 shares of [Linwood Park]
Inc.
500.
50 shares of Construction
Corp.
500.
50 shares, common stock of
[Teaneck Gardens] Inc.
97,333.
Total
$1,333,333. and whereas it is intended that the use of the above separate valuations shall in no way at any time prejudice or be binding upon any of the parties hereto or affect any of their rights and remedies hereunder, at any future time or in the event of a default under this agreement and/or the sale of any security deposited hereunder; * * * The listed sums had no relation to actual value and Sarner agreed to indemnify petitioner for any loss suffered due to Paragraph 13. Sarner Bros., Inc., borrowed $650,000 from the Mastan Company. Petitioner did not participate in the *276 issuance of said loan. In accordance with the agreement of August 29, 1950, and on that date, petitioner received a cashier's check in the amount of $650,000 and a promissory note for $683,333. Also on this date, petitioner and Sarner, as partners, executed a deed to the approximately 7 acres of land designated for the shopping center in favor of Linwood Park, Inc., and petitioner resigned as an officer and director of all the corporations except Linwood Park, Inc., and Linwood Park, Inc. Sections 1, 2, 4, 5, 10, and 11. He continued as an officer and director in the latter corporations only for security purposes, and until he was paid the balance of the agreed price. At the same time, petitioner deposited with an escrow agent his resignations in the above enumerated corporations to be held until final payment was made. On September 15, 1950, the balance of the agreed price, i.e., $683,333, was paid to petitioner by a certified check of Sarner Bros., Inc., and his resignations thereupon became effective. The stock surrendered by petitioner was ultimately acquired as Treasury stock by the relevant corporations. Teaneck Gardens, Inc., was not formed or availed of principally for *277 the construction of property with a view to the realization by its shareholders of gain attributable to a sale or exchange of its stock or a distribution to its shareholders. Petitioner was never in a position to determine the policies of any of the 16 corporations involved herein, whether by reason of owning a majority of voting stock or otherwise. Opinion There is no dispute that the Teaneck Gardens project was completed no later than April 1949. We have found as a fact that no view to a sale of petitioner's stock existed during construction. We further find and hold, from the record as a whole, that the circumstances which caused the eventual sale could not reasonably have been anticipated. Prior to March or April 1950, the petitioner-Sarner relationship was amicable. It could not reasonably be foreseen that Sarner would attempt to misappropriate approximately $685,000 of corporate funds. Sale of petitioner's stock was not contemplated as a recognized possibility at any time during Teaneck Gardens, Inc., construction. We therefore find that Teaneck Gardens, Inc., was not within the purview of section 117(m) [2] and the corresponding regulations. [3]
*278 The record indicates that some of the 13 Linwood Park Section projects were completed before an actual view to sell existed and that others were not. But we need not make these determinations, for Sarner never contemplated selling his share or liquidating the corporations, and we have found as a fact that petitioner was never in a position to determine the policies of any of the 16 corporations, whether by reason of owning a majority of voting stock or otherwise. Indeed, the record supports the proposition that Sarner was the active and dominant shareholder, with petitioner's role that of a "silent partner." We therefore must rely on Sylvester J. Lowery, 39 T.C. - (March 21, 1963), and hold that petitioner's gain on the sale of his relevant shares was not within the purview of section 117(m) and the corresponding regulations. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1939, as amended.↩
2. SEC. 117. CAPITAL GAINS AND LOSSES. (m) Collapsible Corporations. - (1) Treatment of Gain to Shareholders. - Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset. (2) Definitions. - (A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in subsection (a)(1)(A), or for the holding of stock in a corporation so formed or availed of, with a view to - (i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, and (ii) the realization by such shareholders of gain attributable to such property. (B) For the purposes of subparagraph (A), a corporation shall be deemed to have manufactured, constructed, produced, or purchased property, if - (i) it engaged in the manufacture, construction, or production of such property to any extent. (ii) it holds property having a basis determined, in whole or in part, by reference to the cost of such property in the hands of a person who manufactured, constructed, produced, or purchased the property, or (iii) it holds property having a basis determined, in whole or in part, by reference to the cost of property manufactured, constructed, produced, or purchased by the corporation. ↩
3. Sec. 29.117-11(b), Regs. 111 [T.D. 5999, 1953-1 C.B. 187] Determination of collapsible corporation. - With respect to taxable years ending after December 31, 1949, but only with respect to gain realized after such date, a collapsible corporation is defined by section 117(m)(2)(A) to be a corporation formed or availed of principally for the * * * construction * * * of property, or for the holding of stock in a corporation so formed or availed of, with a view to (1) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation * * * constructing * * * the property of a substantial part of the net income to be derived from such property, and (2) the realization by such shareholders of gain attributable to such property. * * *
Under section 117(m)(2)(A), the corporation must be formed or availed of with a view to the action therein described, that is, the sale or exchange of its stock by its shareholders, or a distribution to them, prior to the realization by the corporation * * * constructing * * * the property of a substantial part of the net income to be derived from such property, and the realization by the shareholders of gain attributable to such property. This requirement is satisfied in any case in which such action was contemplated by those persons in a position to determine the policies of the corporation, whether by reason of their owning a majority of the voting stock of the corporation or otherwise. The requirement is satisfied whether such action was contemplated unconditionally, conditionally, or as a recognized possibility. If the corporation was so formed or availed of, it is immaterial that a particular shareholder was not a shareholder at the time of the * * * construction, * * * of the property, or if a shareholder at such time, did not share in such view, and any gain of such shareholder on his stock in the corporation shall be treated in the same manner as gain of a shareholder who did share in such view. * * * A corporation is formed or availed of with a view to the action described in section 117(m)(2)(A) if the requisite view existed at any time during the * * * construction * * * referred to in that section. Thus, if the sale, exchange, or distribution is attributable solely to circumstances which arose after the * * * construction * * * (other than circumstances which reasonably could be anticipated at the time of such * * * construction * * *), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of. However, if the sale, exchange, or distribution is attributable to circumstances present at the time of the * * * construction, * * * the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of.↩